1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JOHN MATTHEW RAY,

11              Petitioner,              No. CIV S-01-1294 FCD JFM P

12        vs.

13   ROSEANNE CAMPBELL,
     Warden, et al.,
14
                Respondents.            FINDINGS & RECOMMENDATIONS
15
     _____/
16

17              Petitioner is a state prisoner proceeding pro se with an application for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1994 conviction on

19   charges of second degree murder with use of a firearm and assault with a firearm.  He seeks relief

20   on the grounds that his trial counsel and appellate counsel rendered ineffective assistance.  Upon

21   careful consideration of the record and the applicable law, the undersigned will recommend that

22   petitioner's application for habeas corpus relief be denied.

23                   PROCEDURAL AND FACTUAL BACKGROUND

24              At approximately 10 p.m. on June 16, 1993, Kevin Glavin, Vincent
                Dostal, and Chad Norris walked to the shopping center across the
25              street from Glavin's apartment in Fairfield, California, to rent a
                video.  After renting the video, they went to Albertson's to buy
26              some beer.  While in Albertson's, they encountered [petitioner] and

1

his codefendant, Rodney Frazier.[1] [Petitioner] and Frazier had been drinking at Frazier's wife's house, and had gone to Albertson's to buy more beer before the store closed at 11 o'clock.

As Dostal was walking down the aisle toward the beer cooler, [petitioner] and Frazier were coming toward him, walking side by side. Dostal walked between them, turning his shoulders to get through without touching them. Apparently offended that Dostal did not walk around him and his friend, Frazier told Dostal to "excuse" himself. Dostal turned around and asked Frazier what he had said. Frazier told Dostal that he "wasn't shit" and that, just because he was big,[2] he could not walk between [petitioner] and Frazier like that. Dostal started to respond but Glavin grabbed his arm and told him it wasn't worth it. Dostal and Glavin then went to the beer cooler and selected a 12-pack of beer.

While Glavin, Dostal and Norris were selecting their beer, [petitioner] and Frazier went to the checkout. [Petitioner] purchased two 40-ounce bottles of beer. Rita Golden and her three children got in line behind [petitioner] and Frazier. Ms. Golden testified that [petitioner] and Frazier had red eyes and appeared to be drunk, and that [petitioner] was arguing with the clerk about the validity of his driver's license.

Glavin, Dostal, and Norris got into the checkout line behind the Goldens. Before they got in line, Frazier made a comment about how large they were but the men did not respond at that point. Frazier continued talking, saying how he "love[d] to beat up people's children" and, apparently challenged the three men by saying, "We will each take one and a half of you." [Petitioner] said "Yeah" after Frazier made these comments. Again, Glavin, Dostal, and Norris did not respond, but they did go to a different checkstand that had opened. Frazier called out, saying "We will see you outside." Ms. Golden testified that Frazier was being really rude and obnoxious, and that his comments were "threatening" to the men behind her in line. She stated that Glavin, Dostal, and Norris were not being obnoxious or rude, and that she did not see them make faces at [petitioner] or Frazier.

When they were finished at the checkstand, [petitioner] and Frazier left through the "right-hand door" of Albertson's. As they left, [petitioner] called out to the three men saying, "If you pussies want some, we will be outside on the bench." Glavin, Dostal, and Norris were still making their purchase when [petitioner] and

---

[1] Frazier was tried for felony assault with a firearm, and misdemeanor assault, but was acquitted of both charges.

[2] Dostal is 6 feet, 4 inches tall and weighs 270 pounds. At the time, he was on the local college football team.

Frazier left.  Rather than go out the door used by [petitioner] and Frazier, they went out the "left" door of Albertson's so as to "avoid a confrontation."  As Glavin, Dostal, and Norris walked back towards Glavin's apartment, they heard voices calling out to them, saying "Good night, ladies," and "a bunch of garbage."  Glavin and Dostal denied that they responded to these taunts.

[Petitioner] and Frazier then charged Dostal, throwing their full bottles of beer at his head.  Dostal dodged the bottles, threw Frazier off of him, then tackled [petitioner].  Dostal and [petitioner] fought on the ground.  Dostal plainly got the better of [petitioner], at one point banging [petitioner's] face onto the pavement.  Frazier fought with Norris, then ran over to [petitioner] to help him in his fight with Dostal.  When Dostal got off [petitioner], [petitioner's] face was "covered with blood."  At that point, the two groups separated, and Glavin, Dostal, and Norris ran back to Glavin's apartment.

Ms. Golden and her children witnessed the aftermath of the fight.  Just before 11 p.m., as she was leaving Albertson's, Ms. Golden saw [petitioner] in the parking lot.  He had removed his T-shirt and was holding it to his face, which was all bloody.  He looked "very angry."  Ms. Golden went to a nearby phone and called 911 to report a fight.  She then saw [petitioner] and Frazier get into a black car and begin driving.  She told her daughters to get the license plate number, then drove to a nearby K-Mart to call 911 again to report the license number.[3]  She then returned to the Albertson's parking lot.

When Glavin, Dostal, and Norris reached Glavin's apartment, they realized the videotape they rented had been dropped during the fight.  Glavin wanted to go back for the video because he was afraid [petitioner] or Frazier might find it, learn his address from Blockbuster, then "mess with" him.  Norris and Dostal would not let Glavin go back alone and so, after Glavin put on a sweatshirt and different shoes, the three men headed back to the shopping complex.

As Glavin, Dostal, and Norris walked across the street and onto a grassy area on the edge of the parking lot, they saw a black car with its headlights off entering the shopping center parking lot.[4]

---

[3]  The plate number reported by the Goldens was 3AJY012, only one digit different than the 3AJY062 plate on [petitioner's] BMW.  It was stipulated at trial that police department records showed there was a phone call at 10:51 p.m. about a fight in Albertson's parking lot, another call at 10:52 p.m. saying the fight was breaking up, and a third call at 10:53 saying the people who were fighting had left in their cars.

[4]  Two other witness, [sic] Rick Cirillo and Danielle Collier, also saw [petitioner] and Frazier driving in [petitioner's] car without headlights in the area near Albertson's on the night of June 16, 1993.  Cirillo testified that he and Collier left a pizza parlor in the Albertson's shopping

3

[Petitioner] was driving the car.  Glavin saw the car first and yelled, "Oh, shit.  That's them."  The three men started running back toward the apartment complex.  As they were running, Glavin and Dostal heard gunshots.  Both men dove onto the ground.  Glavin heard a total of six or severn shots that appeared to come from [petitioner's] car.  Ms. Golden, who by this point had just returned to the Albertson's parking lot, also said she heard seven gunshots.[5]  When the shooting stopped, Glavin looked up and saw the black car pulling out of the shopping center parking lot.  Glavin was not hit, but Dostal was wounded in the right foot.  Glavin and Dostal crawled over to Norris, who was "just laying there" on his chest, and saw a bullet hole in Norris' back.  Norris had also sustained a bullet wound to his buttocks.  Glavin and a bystander administered first aid to Norris, but he did not survive.

A pathologist testified at trial that Norris was killed by a .45-caliber bullet, which entered the back of his neck and severed his spinal cord.  The bullet was a hollow-point "Black Talon," a type of ammunition which is "designed to expand in soft tissue," causing more damage than an ordinary bullet.  Seven .45 caliber shell casings were found at the scene.

[Petitioner] testified in his own defense.  He stated that he and Frazier had gone to Cordelia on the afternoon of June 16, 1993, to buy two Maxfield Parish prints as a birthday gift for [petitioner's] mother.  After delivering the gift to his mother's house, [petitioner] and Frazier decided to buy some beer at Albertson's.  They bought four 40-ounce bottles of beer, then went to Frazier's wife's house, arriving at approximately 8 p.m.  After consuming two bottles of

---

center between 10:30 and 11:00 p.m., and were about a quarter mile away when they saw a black BMW "coming up on us and it was coming rather fast and kind of swerving at us."  The BMW pulled up alongside Cirillo's car and he heard [petitioner] yell, "Where are they?  Where are they?  in an "agitated" tone of voice.  Cirillo said he didn't know what [petitioner] was talking about.  Cirillo then heard the passenger say, "Oh, that's not them.  That's not them."  The BMW then turned around and headed back toward Albertson's.  Fearing that the occupants of the BMW were looking for their friends, who were still at the shopping complex, Cirillo and Collier also returned to Albertson's.  They waited until the BMW was safely away from them to enter the store to find their friends.  While waiting, they could see the BMW cruising around the parking lot, going 40 to 45 miles per hour.  After determining that their friends were safe, Cirillo and Collier started to leave but, as they did, they "heard several gunshots ringing out" near the Home Savings building.  They also saw the BMW driving between the Home Savings and Blockbuster Video store.

[5]  When the shooting started, Ms. Golden's children began screaming and she was panicking so she drove home and called the police again to report the gunshots.  Ms. Golden and one of her daughters subsequently identified [petitioner] and Frazier in a photo line-up.  It was stipulated at trial that police department records showed a 11:02 p.m. phone call reporting gunshots.  Thus, approximately 10 minutes passed between the end of the fight and the time the shooting was reported.

beer each, [petitioner] and Frazier decided to return to Albertson's to buy more beer. [Petitioner] testified that he had eaten only one meal that day and was "sure [he] was legally drunk" when he went to Albertson's.

[Petitioner's] account of his interaction with Glavin, Dostal, and Norris in the grocery store was, in most material respects, consistent with that of other witnesses. However, [petitioner] said Dostal had bumped into both Frazier and him when they passed each other near the beer cooler. As to the instigation of the altercation in the parking lot, [petitioner] said Dostal replied to Frazier's taunts by saying, "Bye, bitches." He also said that the two groups of men approached each other, and that Dostal and Frazier started to fight. [Petitioner] claimed that Dostal then "came straight at me," so he threw his 40-ounce beer bottle at Dostal. After he threw the bottle, [petitioner] said Dostal tackled him, punched him as they wrestled to the ground, and began slamming his head onto the ground.

[Petitioner] admitted that, after the fight broke up, he told Frazier he "wanted to find Vince [Dostal] and smash his head in the street like he did to me." He and Frazier got into his car and began driving around "trying to find them." [Petitioner] also admitted that he was "furious" as he and Frazier looked for the other men. He was "kind of surprised, and then mad" when he saw Glavin, Dostal and Norris walking across the grass at the outskirts of the Albertson's parking lot. He "started to approach them," and "the next thing [he] knew," he took a loaded .45-automatic handgun out of the door panel of his car and started shooting at the group of men. He testified that, when he pointed and fired the gun, "it was like without thought. I did not have an intent." After firing the gun, [petitioner] drove away, still feeling "mad" and "pissed off."

After the shooting, [petitioner] and Frazier drove to Frazier's wife's house, where [petitioner] heard on a police scanner the [sic] "somebody was down" and "somebody was DOA." [Petitioner] realized he had shot someone, and that the victim was probably dead. He left the house, and went to Vacaville to visit his infant daughter. He turned himself into [sic] the police on June 18, 1993, after dumping the gun in a motel trash bin.

At trial, [petitioner] claimed he did not remember aiming the gun at anyone, but acknowledged that he was a good shot. He testified that he had used the .45 for target practice and that he "pretty much" hit whatever he aimed at when shooting at targets. He claimed he kept the .45 in the car "for [his] own protection," citing an incident where he had been threatened by a man with a baseball bat.

/////

1    After a two-week trial, the jury deliberated for one week and
     reached a verdict on February 14, 1994.  As to count 1 of the
2    information, the jury found [petitioner] not guilty of first degree
     murder, but guilty of second degree murder for the killing of Chad
3    Norris.  As to count 2 of the information, the jury found
     [petitioner] not guilty of the attempted murder of Vincent Dostal,
4    but guilty of assaulting Dostal with a firearm.  As to the remaining
     counts, for the alleged assault by [petitioner] (count 3) and Frazier
5    (count 4) on Dostal with their beer bottles in the Albertson's
     parking lot, the jury found both defendants not guilty.[6]

6

7    (Opinion at 2-7.)

8                                    ANALYSIS

9    I.  Standards for a Writ of Habeas Corpus

10          Federal habeas corpus relief is not available for any claim decided on the merits in

11   state court proceedings unless the state court's adjudication of the claim:

12          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
13          determined by the Supreme Court of the United States; or

14          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
15          State court proceeding.

16   28 U.S.C. § 2254(d).

17          Under section 2254(d)(1), a state court decision is "contrary to" clearly

18   established United States Supreme Court precedents "if it 'applies a rule that contradicts the

19   governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are

20   materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at

21   different result.  Early v. Packer, 573 U.S. 3, 8 (2002) (quoting Williams v. Taylor, 529 U.S. 362,

22   405-406 (2000)).

23   /////

24

25          [6] This statement of facts is taken from the April 13, 1995, opinion by the California
     Court of Appeal for the First Appellate District (hereinafter Opinion), at pgs. 2-7, appended as
26   Exhibit C to Respondent's Answer, filed on December 23, 2002.

                                         6

1    Under the "unreasonable application" clause of section 2254(d)(1), a federal

2    habeas court may grant the writ if the state court identifies the correct governing legal principle

3    from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

4    prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

5    simply because that court concludes in its independent judgment that the relevant state-court

6    decision applied clearly established federal law erroneously or incorrectly.  Rather, that

7    application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

8    (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

9    question, is left with a 'firm conviction' that the state court was 'erroneous.'")

10    The court looks to the last reasoned state court decision as the basis for the state

11    court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

12    reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

13    habeas court independently reviews the record to determine whether habeas corpus relief is

14    available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

15    II.  Ineffective Assistance of Counsel

16    Petitioner claims that his trial counsel rendered ineffective assistance because of

17    his failure to investigate and present an adequate defense.  He also claims that his appellate

18    counsel rendered ineffective assistance because of his failure to raise on appeal a claim of

19    ineffective assistance of trial counsel.  After setting forth the relevant legal principles, this court

20    will analyze these claims in turn below.

21    A.  Legal Standards

22    The Sixth Amendment guarantees the effective assistance of counsel.  The United

23    States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

24    Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

25    counsel, a petitioner must first show that, considering all the circumstances, counsel's

26    performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

7

1  identifies the acts or omissions that are alleged not to have been the result of reasonable

2  professional judgment, the court must determine whether, in light of all the circumstances, the

3  identified acts or omissions were outside the wide range of professionally, competent assistance.

4  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of

5  counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide

6  range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting

7  Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised

8  acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

9  695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

10          Second, a petitioner must establish that he was prejudiced by counsel's deficient

11  performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

12  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

13  been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine

14  confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

15  F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's

16  performance was deficient before examining the prejudice suffered by the defendant as a result of

17  the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

18  lack of sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949,

19  955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

20          Defense counsel has a "duty to make reasonable investigations or to make a

21  reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at

22  691.  It has been recognized that "the adversarial process will not function normally unless the

23  defense team has done a proper investigation."  Siripongs v. Calderon (Siripongs II), 133 F.3d

24  732, 734 (9th Cir. 1998)(citing Kimmelman, 477 U.S. at 384).  Therefore, counsel must, "at a

25  minimum, conduct a reasonable investigation enabling him to make informed decisions about

26  how best to represent his client."  Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th Cir. 1995)

8

1   (quoting Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citation and quotations

2   omitted).  On the other hand, where an attorney has consciously decided not to conduct further

3   investigation because of reasonable tactical evaluations, his or her performance is not

4   constitutionally deficient.  See Siripongs II, 133 F.3d at 734; Babbitt v. Calderon, 151 F.3d 1170,

5   1173 (9th Cir. 1998); Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995).  "A decision not to

6   investigate thus 'must be directly assessed for reasonableness in all the circumstances.'"

7   Wiggins, 539 U.S. at 533 (quoting Strickland, 466 U.S. at 691).  See also Kimmelman, 477 U.S.

8   at 385 (counsel "neither investigated, nor made a reasonable decision not to investigate");

9   Babbitt, 151 F.3d at 1173-74.  A reviewing court must "examine the reasonableness of counsel's

10   conduct 'as of the time of counsel's conduct.'"  United States v. Chambers, 918 F.2d 1455, 1461

11   (9th Cir. 1990) (quoting Strickland, 466 U.S. at 690).  Furthermore, "'ineffective assistance

12   claims based on a duty to investigate must be considered in light of the strength of the

13   government's case.'"  Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (quoting Eggleston

14   v. United States, 798 F.2d 374, 376 (9th Cir. 1986)).  See also Hayes v. Woodford, 301 F.3d

15   1054, 1070 (9th Cir. 2002).

16       B.  Trial Counsel

17           Petitioner claims that his trial counsel rendered ineffective assistance because of

18   his failure to investigate and present evidence in support of either a "heat of passion" or

19   "diminished actuality" defense.  He explains his claim as follows:

20           In the instant case, trial counsel was presented with abundant
            evidence that the killing was committed in the "heat of passion"
21           and/or "diminished actuality."  Counsel chose to argue this defense
            in his closing without pursuing the available viable evidence to
22           realize the strength of it.  There was no way that trial counsel could
            adequately advise petitioner on this strategy without further
23           pursuing the facts which might support the defense of "heat of
            passion" and "diminished actuality."  Defense counsel simply
24           provided ineffective assistance by failing to fully investigate the
            best available defenses."

25

26   (Points and Authorities attached to Pet. (P&A) at 3.)  Petitioner also contends that the evidence

9

1   available to defense counsel prior to trial would have supported "an unconsciousness or mental

2   defense to second-degree murder and assault with a deadly weapon, or even to voluntary

3   manslaughter." (Id. at 11.)  Petitioner argues his counsel should have arranged for him to

4   undergo a mental and physical examination because counsel knew that petitioner was intoxicated

5   during the events in question and had sustained head injuries during his fight with Dostal.

6   Petitioner also faults counsel for failing to "support his theory of defense" by offering the

7   testimony of witnesses who would have testified that petitioner had difficulty speaking, walking

8   and remembering the events in question shortly after the shooting.  (Pet. at 4a.)  He argues that

9   the lack of any defense witnesses "left the jury to believe petitioner's testimony" (id.) and

10  "shifted the burden of persuasion to the defendant."  (Traverse at 3.)  In short, petitioner argues

11  that his trial counsel improperly failed to investigate and support either the defense he chose to

12  offer ("heat of passion") or a defense involving the theory that petitioner was unable to form

13  intent because of intoxication and head injuries.

14          In support of his claim, petitioner has submitted: (1) his declaration, in which he

15  states that he discussed with trial counsel his "state of mind" and the injuries he suffered in the

16  beating and that counsel told him he "would be hiring an expert witness (Neurologist) to testify

17  to my head injuries, concussion and the inability to reason at the time of the shooting" (Pet., Ex.

18  B); (2) declarations from several friends and family members who saw petitioner shortly after the

19  incident or the next day and observed that petitioner had received injuries from the beating, his

20  speech was slowed, and he appeared confused or slow (Pet., Exs. C-E, H - K, N, P, Q); (3) the

21  declaration of one of petitioner's jurors, who states that he believes he and "at least three other

22  jurors" would have "voted for voluntary manslaughter" if there had been evidence of "head

23  injury or psychological or psychiatric condition" (Pet., Ex. F); (4) the declaration of petitioner's

24  co-defendant, Rodney Frazier, who states that petitioner was dazed and injured after the beating

25  and the next morning (Pet., Ex. G); (5) the declaration of a criminal defense lawyer who states

26  that a reasonably competent defense attorney would have had "a psychiatrist, psychologist or

medical personnel" evaluate petitioner and would have called witnesses to testify to petitioner's head injuries and subsequent mental state and that if counsel had done this, petitioner would "likely" had been convicted of manslaughter (Pet., Ex. L); and (6) a psychological evaluation of petitioner dated January 6, 1999, in which the evaluating counselor concludes that although there was no indication of current or earlier brain trauma or impaired brain function, she could not definitively rule out prior brain trauma as a result of the beating petitioner received immediately before the shooting or that an injury had a negative impact on petitioner's behavior.  (Pet., Ex. M at 6, 7 , 8.)

Petitioner's claim in this regard was rejected by the Solano County Superior Court in a written decision on petitioner's petition for writ of habeas corpus.  (Answer, Ex. I.)  The claim was summarily denied by the California Court of Appeal and Supreme Court on habeas review.  (Answer, Exs. J, L.)  Respondents urge that the claim be denied on the merits.

In response to petitioner's habeas corpus petition, the California Superior Court issued an order to show cause "on the sole issue of whether or not petitioner received ineffective assistance of trial counsel if counsel failed to investigate, research or present evidence in support of a mental defense."  (Pet., Ex. A; Answer, Ex. I at 1.)  The court also appointed counsel and granted leave to file amended pleadings.  (Id.)  Ultimately, the Superior Court rejected petitioner's claim of ineffective assistance of trial counsel, stating as follows:

> The court after having read and considered all documents and pleadings on file herein, finds that the petitioner has failed to meet his burden of proving that he received ineffective assistance from his trial counsel.  The facts as set forth by the Court of Appeal in its decision filed April 13, 1995, describe a purposeful, vengeful, angry petitioner set on righting the perceived wrong which he had received, i.e., physical injuries from a fist fight.  Petitioner by his own testimony was a proficient marksman who took a lethal weapon loaded with bullets designed to inflict more damage to a human body than regular bullets and stealthily drove around at night with his car's headlights out seeking his victims (participants in a fist fight).  When he found them, he approached them, took his gun, which he knew was loaded, aimed at them and shot one victim dead and wounded the other.  At his trial, he further testified that although he had been drinking alcohol and described himself

as "legally drunk" ten minutes before the shooting and,
additionally, that he had received blows to the head in a fist fight
with the victims, he remembers and is able to relate the facts step
by step and with clarity leading up to the shooting, at the time of
the shooting and after the shooting.

Petitioner argues that his trial counsel's performance was deficient
in that he failed to consult an expert in psychiatric trauma and
investigate the validity of or present defenses of either diminished
actuality or heat of passion, which might arguably have convinced
the jury to return a verdict of voluntary manslaughter rather than
second degree murder.  However, when presented with the detailed
recitation of facts testified to by the defendant at trial, his defense
attorney cannot be criticized when factually it is not clear that his
attorney had reason to believe that such expert testimony would
have been warranted.  As stated in <u>Wilson v. Henry</u> 185 F.3d 986
at 990, "A decision not to pursue testimony by a psychiatric expert,
when no mental state defense seems likely, is not unreasonable
under <u>Strickland</u>.  (Referring to our controlling authority on the
issue of ineffective assistance of counsel, <u>Strickland v.
Washington</u>, 466 U.S. 668, 104 S. Ct. 2052.)  Given the vengeful,
purposeful, enraged actions of the petitioner after the fist fight with
his ultimate victims, his action in retrieving his car, driving around
the area seeking out his victims with his lights out, arming himself
with a gun, firing the weapon at the victims knowing that he would
probably hit what he aimed at, and knowing that the gun was
loaded, would not lead a reasonable attorney to conclude that the
petitioner did not actually have the capacity to form the necessary
intent to do what he did.  Trial counsel presented what he was
reasonably able to present to the trier of facts in order to reduce
defendant's liability from first degree murder to second degree
murder, and this court finds no ineffective assistance of [sic] as
claimed by the petitioner.

(<u>Id.</u> at 2-3.)

Petitioner's trial counsel was faced with evidence giving rise to two possible

defenses: (1) heat of passion; and (2) a lack of intent due to head injury or intoxication.  He chose

to rely on the former, arguing that petitioner deliberately shot the victims in an enraged state and

only the next day "came to his senses" and turned himself in.  (RT at 914-48.)  The record in this

case discloses a reasonable strategic explanation for counsel's decision to choose this defense.

Most importantly, it was supported by petitioner's trial testimony.  As discussed by the state

appellate court and confirmed by a reading of the state court record, petitioner recalled the

relevant events in detail and described a scenario that indicated he was acting deliberately but in

the heat of passion.  (See e.g., RT at 646-66.)  Specifically, petitioner testified that immediately

after his beating by Dostal he was determined to exact revenge and drove around the parking lot

with a firearm in his car in an attempt to locate the victims.  (RT at 652-55, 659, 665-66.)  It was

reasonable for counsel to rely on petitioner's testimony in this regard to establish a "heat of

passion" defense.  See Strickland, 466 U.S. at 691 ("The reasonableness of counsel's actions may

be determined or substantially influenced by the defendant's own statements or actions"); Turk v.

White, 116 F.3d 1264, 1267 (9th Cir. 1997) ("when the facts that support a certain potential line

of defense are generally known to counsel because of what the defendant has said, the need for

further investigation may be considerably diminished or eliminated altogether").  Cf. Sanders, 21

F.3d at 1456 (nothing in the record, apart from incompetence, suggested "even a colorable

explanation" for counsel's decision not to interview critical information from a key exculpatory

witness).  The court also notes that the testimony of witnesses regarding petitioner's demeanor

hours after the shooting took place would have been largely irrelevant to a defense that

petitioner's actions were committed in the sudden heat of passion.

        Insofar as petitioner argues that a medical expert should have been engaged to

examine him to support a defense that his mental state precluded intent, it is not clear that

counsel had reason to believe that such a defense would have been warranted.  Evidence of a

prior physical attack suffered by the defendant does not automatically put counsel on notice of a

potential mental state defense.  See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999)

("Although counsel was aware that [petitioner] had been beaten the day before the shooting, that

fact alone does not raise the possibility of a strong mental state defense.").  A decision not to

pursue testimony by a psychiatric expert, when no mental state defense seems likely, is not

unreasonable under Strickland.  See Williams v. Calderon, 52 F.3d 1465, 1471 (9th Cir.1995)

(holding that there was no ineffective assistance from failure to hire psychiatrist where there was

no evidence that defendant was not sane).  There is no indication in the record that petitioner

suffered from a mental disease, other than the fact of the prior assault.  In such a situation, a

1  failure to pursue a medical expert is not unreasonable.  Henry, 185 F.3d at 990.[7]

2          To the extent petitioner is arguing that counsel should have presented both a "heat

3  of passion" defense and a defense of lack of intent, his claim must be denied.  It appears that

4  counsel made a strategic tactical decision, after assessing the state of the trial evidence, to

5  proceed solely with the "heat of passion" defense and dispense with any other defenses he may

6  have prepared for or that may have been available.  Specifically, petitioner provides evidence that

7  counsel called a meeting with the witnesses scheduled to testify and told them that he had

8  decided not to use their testimony after all.  (Pet., Ex. N, P.)  Because it appears that counsel's

9  decision to rely solely on petitioner's testimony to support a "heat of passion" defense was a

10 thoughtful tactical decision, this court must presume that counsel's conduct was within the range

11 of competency.  See Strickland, 466 U.S. at 687 (counsel's tactical decisions are "virtually

12 unchallengeable"); Harris v. Pulley, 885 F.2d 1354, 1368 (9th Cir. 1988).

13         Petitioner has also failed to demonstrate prejudice.  Notwithstanding the

14 declarations submitted by petitioner in support of this claim, petitioner has failed to show that the

15 verdict would have been different had counsel chosen a different defense, obtained a psychiatric

16 or medical examination, or introduced testimony of witnesses who had observed petitioner's

17 behavior hours or days after the events in question.  The California Superior Court's decision

18 rejecting petitioner's claim of ineffective assistance of trial counsel, after reviewing the same

19 exhibits petitioner has filed in this court, is not an "objectively unreasonable" application of

20 Strickland.  Rompilla v. Beard, ___ U.S. ___, 125 S. Ct. 2456, 2462 (2005) (citations omitted).

21 Accordingly, petitioner is not entitled to relief on this claim.

22 /////

23 /////

24

---

25      [7] "Although only Supreme Court law is binding on the states, [Ninth] Circuit precedent
26 remains relevant persuasive authority in determining whether a state court decision is objectively
   unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003).

C.  Appellate Counsel

Petitioner claims that appellate counsel rendered ineffective assistance because of his failure to raise on appeal a claim of ineffective assistance of trial counsel.

The Strickland standards apply to appellate counsel as well as trial counsel.  Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989). However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points."  Jones v. Barnes, 463 U.S. 745, 751 (1983).  Counsel "must be allowed to decide what issues are to be pressed."  Id.  Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined."  Id.  See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy.")  There is, of course, no obligation to raise meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this context, petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal.  Miller, 882 F.2d at 1434, n.9.

Petitioner has failed to demonstrate either incompetence or prejudice with respect to this claim.  Appellate counsel's decision to reject a claim of ineffective assistance of trial counsel and to press only claims with more merit was "within the range of competence demanded of attorneys in criminal cases."  McMann v. Richardson, 397 U.S. 759, 771 (1970).  Further, as discussed above, a claim of ineffective assistance of trial counsel lacks merit.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

/////

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 23, 2005.

UNITED STATES MAGISTRATE JUDGE

008:ray1294.hc